**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| GORSS MOTELS, INC., a Connecticut corporation, individually and as the representative of a class of similarly-situated persons, | ) ) ) ) ) | |
| | ) | Civil Action No. 3:17-cv-00403-JBA |
| Plaintiff, | ) ) | Hon. Janet Bond Arterton |
| v. | ) ) | |
| AT&T MOBILITY LLC and AT&T MOBILITY NATIONAL ACCOUNTS LLC, | ) ) ) ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS .......................................................................................... 2

      A.    Allegations of the Complaint. ................................................................. 2

      B.    Gorss Motels' Relationship With Wyndham. ........................................ 3

      C.    Wyndham's Strategic Sourcing Program ................................................ 4

      D.    Gorss Motels Was Fully Informed About the Wyndham Strategic
          Sourcing Program and Its Approved Suppliers. ..................................... 5

      E.    The January 2014 Fax. ........................................................................... 6

      F.    Gorss Motels Chooses To Accrue Additional TCPA Lawsuits. ............ 7

STANDARD ............................................................................................................... 8

ARGUMENT .............................................................................................................. 8

I.     AT&T IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THE FAX
       WAS SENT WITH PERMISSION. ................................................................ 8

      A.    Gorss Motels Provided Permission To Wyndham To Receive Faxes. ... 8

II.    EVEN IF THE FAX AT ISSUE WAS UNSOLICITED, AT&T IS ENTITLED
       TO SUMMARY JUDGMENT. ...................................................................... 11

      A.    Gorss Motels Had an EBR With Both Wyndham and AT&T. ............... 12

      B.    Gorss Motels Provided and Published Its Fax Number. ....................... 13

      C.    The Fax Contained Sufficient Opt Out Language. ............................... 14

III.   GORSS MOTELS IS NOT IN THE TCPA'S ZONE OF INTEREST AND THUS
       LACKS STATUTORY STANDING. .............................................................. 16

      A.    The TCPA Exists to Allow Consumers to Protect and Vindicate Their
          Privacy Rights. ..................................................................................... 17

      B.    Gorss Motels Does Not Fall Within the TCPA's Zone of Interests. .... 18

IV.   AT A MINIMUM, GORSS MOTELS' CLAIM FOR TREBLE DAMAGES
       SHOULD BE STRICKEN. ............................................................................. 19

CONCLUSION ........................................................................................................... 21

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adamcik v. Credit Control Servs., Inc.*,
  832 F. Supp. 2d 744 (W.D. Tex. 2011)................................................................20

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).................................................................................................8

*Bais Yaakov of Spring Valley et al. v. FCC*,
  852 F.3d 1078 (D.C. Cir. 2017), The FCC ........................................................8, 9

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).................................................................................................8

*Craftwood Lumber Co. v. Horizon Glob. Corp.*,
  2018 WL 6920394 (N.D. Ill. Apr. 12, 2018) .......................................................16

*Faulkner v. National Geographic Enters. Inc.*,
  409 F.3d 26 (2d Cir. 2005)....................................................................................11

*Gorss Motels, Inc., v. Cetis, Inc.*
  No. 16-1368 (D. Conn. June 18, 2018), Dkt. No. 113 ..........................................19

*Gorss Motels Inc. v. Ilen Products Ltd.*,
  No. 3:18-cv-01052-AVC ........................................................................................19

*Gorss Motels Inc. v. Otis Elevator Company et al.*,
  No. 3:16-cv-01781-VAB ........................................................................................19

*Gorss Motels Inc. v. Safemark Systems, LP*,
  931 F.3d 1094 (11th Cir. 2019) .............................................................2, 9, 10, 11

*Gorss Motels Inc. v. Sprint Solutions, Inc.*,
  Case No. 3:17-cv-00546-JAM ...............................................................................19

*Gorss Motels Inc. v. Sysco Guest Supply, LLC*,
  3:16-cv-01911-VLB ...............................................................................................19

*Harris v. World Fin. Network Nat'l Bank*,
  867 F.Supp.2d 888 (E.D. Mich. 2012)..................................................................20

*Haysbert v. Navient Solutions, Inc.*,
  2016 WL 890297 (C.D. Cal. Mar. 8, 2016)..........................................................19

*Landsman & Funk, P.C. v. Lorman Bus. Ctr., Inc.*,
  2009 WL 602019 (W.D. Wis. Mar. 9, 2009).................................................10, 15

*Lart v. Trinity Physician Fin. & Ins. Servs.*,
780 F.3d 1101 (11th Cir. 2015) ............................................................................19

*Liberty Glob Logistics LLC v. U.S. Mar Admin.*,
2014 WL 4388587 (E.D.N.Y. Sept. 5, 2014) .......................................................16

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992).........................................................................................15, 17

*Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986).................................................................................................8

*McNamara v. City of Chicago*,
138 F.3d 1219 (7th Cir. 1998) ..............................................................................16

*Practice Mgm't Support Servs. Inv. v. Appeal Sols., Inc.*,
2010 WL 748170 (N.D. Ill. Mar. 1, 2010)..............................................................9

*Rothstein v. UBS AG*,
708 F.3d 82 (2d Cir. 2013)....................................................................................16

*Spokeo Inc. v. Robins*,
136 S.Ct. 1540 (May 16, 2016)..............................................................................15

*St. Louis Heart Ctr. Inc. v. Nomax*,
899 F.3d 500 (8th Cir. 2018) ................................................................................16

*Stoops v. Wells Fargo Bank, N.A.*,
197 F.Supp.3d 782 (W.D. Pa. 2016).................................................................17, 18

*Tel. Sci. Corp. v. Asset Recovery Sols., LLC*,
2016 WL 4179150 (N.D. Ill. Aug. 8, 2016) .....................................................17, 18

*United States v. Quintieri*,
306 F.3d 1217 (2d Cir. 2002)..................................................................................9

*Valley Forge Christian Coll. v. Americans United for Separation of Church &*
*State, Inc.*
454 U.S. 464 (1982)...............................................................................................16

*Warnick v. DISH Network, LLC*,
2014 WL 12537066 (D. Colo. Sept. 30, 2014)......................................................21

**Statutes**

47 U.S.C § 227.......................................................................................................10

47 U.S.C. § 227(a)(5).............................................................................................9

47 U.S.C. §227(b)(1)(C)(i)-(iii) .............................................................................12

47 U.S.C. § 227(b)(3) ....................................................................................................19

**Other Authorities**

47 C.F.R. § 64.1200(a)(4)(ii)(A) ...................................................................................14

47 C.F.R. § 64.1200(a)(4)(ii)(B) ...................................................................................14

47 C.F.R. § 64.1200(f)(6) ...............................................................................................12

47 CFR § 64.1200(a)(4) .................................................................................................12

47 CFR § 64.1200(a)(4)(iii) .....................................................................................15, 16

Fed. R. Civ. P. 12(b)(6) ..................................................................................................15

Fed. R. Civ. P. 23(f) .........................................................................................................9

Fed. R. Civ. P. 56(a) .........................................................................................................8

*In the Matter of Rules and Regulations Implementing the Telephone Consumer*
   *Protection Act of 1991*, Report and Order and Third Order on
   Reconsideration, 21 F.C.C. Rcd. 3787 (April 6, 2006) ....................................12, 13

*In re Rules & Regulations Implementing the Telephone Consumer Protection Act*
   *of 1991*, 68 Fed. Reg. 44144, 44168 (FCC July 25, 2003) .....................................9

*In re: Rules and Regulations Implementing the Telephone Consumer Protection*
   *Act of 1991: Regarding the Commission's Opt-Out Notice Requirement for*
   *Faxes Sent With the Recipient's Prior Express Permission*, 84 Fed. Reg.
   10266, 10266 (FCC Mar. 20, 2019).........................................................................9

Order, *Petitions for Reconsideration and/or Declaratory Ruling and Retroactive*
   *Wavier of 47 C.F.R. §64.1200(a)(5)(iv) Regarding the Commission's Opt-Out*
   *Notice Requirements for Faxes Sent with the Recipient's Prior Express*
   *Permission,* 33 FCC Rcd, 11179, 11179 (Nov. 14, 2018).......................................9

Defendants AT&T Mobility LLC and AT&T Mobility National Accounts LLC (collectively, "AT&T") respectfully submit this memorandum in support of their motion for summary judgment.

## INTRODUCTION

For more than twenty years, Plaintiff Gorss Motels, Inc. ("Gorss Motels") operated a hotel in Cromwell, Connecticut, first as a Super 8 Motel franchise and later as a franchise for the Wyndham Hotel Group ("Wyndham") under the Super 8 brand. As part of its franchise relationship with Wyndham, Gorss Motels received offers for discounted goods and services from approved suppliers of Wyndham, including AT&T. Wyndham used faxes (among other tools) to communicate these offers to its franchisees. While acting as a Wyndham franchisee, Gorss Motels collected dozens of faxes sent by suppliers over the years and provided the faxes to its attorney. But Gorss Motels never attempted to opt out of receiving faxes from Wyndham's suppliers and instead continued to provide Wyndham with its fax number to use for contacting it during this period.

In 2016, Gorss Motels sold its hotel. It no longer conducts business but exists only to file lawsuits, a task it has taken to with gusto. Gorss Motels filed more than twenty lawsuits against companies that sent it faxes, including this suit against AT&T. Notwithstanding Gorss Motels' franchise relationship with Wyndham and its participation in Wyndham's approved supplier program, Gorss Motels claims in each of these cases that it never gave its permission to receive marketing faxes from Wyndham's suppliers and the faxes are therefore actionable under the Telephone Consumer Protection Act (the "TCPA").

Summary judgment should be granted in AT&T's favor for the following reasons:

*First*, as the Eleventh Circuit recently held, through its franchise relationship with Wyndham, Gorss Motels gave its permission for faxes sent under the Wyndham supplier

1

program. *Gorss Motels Inc. v. Safemark Systems, LP*, 931 F.3d 1094, 1101-02 (11th Cir. 2019). As a result, the fax at issue is not actionable under the TCPA.

*Second*, even assuming *arguendo* that summary judgment in AT&T's favor is not appropriate on the question of whether the fax was sent with permission, Gorss Motels' claims are barred because the TCPA includes a defense for faxes sent pursuant to an "established business relationship."

*Third*, Gorss Motels, as a professional plaintiff, is not within the "zone of interest" that the TCPA was designed to protect and thus lacks standing.

*Finally*, because AT&T understood it had permission to fax Wyndham's franchisees, it did not violate the TCPA knowingly or willfully and thus Gorss Motels' claim for treble damages must be stricken.

## STATEMENT OF FACTS

### A.     Allegations of the Complaint.

Gorss Motels alleges it received a fax from AT&T advertising a discount on AT&T cellular telephone service for Wyndham franchise owners and employees on or around January 13, 2014. Am. Comp. ¶ 11, Ex. A. Gorss Motels claims that the fax advertises products that were manufactured by and/or provided by AT&T and that the fax was thus sent "on behalf" of AT&T. *Id.* at ¶¶ 13, 15. It also alleges that the fax at issue did not include the proper language for an "opt-out" notice that it believes FCC regulations require. *Id.* at ¶¶ 22-23. In addition to its individual claim, Gorss Motels originally sought to represent a class of similarly situated people who received unwanted faxes from AT&T. *Id.* at ¶ 24. Class certification, however, has been denied, and all that remains of the case for summary judgment purposes is Gorss Motels' individual TCPA claim. Dkt. No. 78.

2

**B.      Gorss Motels' Relationship With Wyndham.**

Wyndham's business encompasses approximately 8,000 hotel properties operating under several brands, one of which is Super 8. SOF ¶¶ 1-2. Wyndham does not own the vast majority of those hotels which are instead operated by independent franchisees, including Gorss Motels. SOF ¶ 3.

In 1988, Gorss Motels entered into a franchise agreement with Super 8 Motels, Inc. to operate a franchise in Cromwell, Connecticut. SOF ¶ 4. Gorss Motels' original franchise agreement (the "1988 Agreement") ran for a twenty-year term until 2008 but was extended in 2009 to run through 2014. SOF ¶¶ 4-5. On September 10, 2014, Gorss Motels entered into a new agreement (the "2014 Agreement") that renewed its franchise relationship with Super 8[1] for another twenty-year term. SOF ¶ 10.

As a franchisee, Gorss Motels provided its fax number as part of its contact information to Wyndham (through its affiliate, Super 8) on a number of occasions. For example, on January 20, 2010, Gorss Motels submitted via facsimile a contact form that provided a fax number ending in '8889. SOF ¶ 6. Likewise, when the 1988 Agreement expired in 2014, Gorss Motels submitted an application on July 22, 2014 to allow it to continue on as a Super 8 franchisee. SOF ¶ 8. That application listed its fax number as part of its contact information. SOF ¶ 9. When Gorss Motels executed the 2014 Agreement with Super 8 in September 2014, the agreement again listed Gorss Motels' fax number as part of its contact information. SOF ¶ 10. And in November 2015, Gorss Motels received an updated "site contact" form from Wyndham. SOF ¶ 7. Gorss Motels returned that contact form and again listed the number ending in '8889 as its fax number. *Id*.

---

[1] Wyndham had acquired the Super 8 brand. SOF ¶ 2.

3

### C.      Wyndham's Strategic Sourcing Program.

Worldwide Sourcing Solutions, Inc. ("WSSI") is a Wyndham affiliate that supports the Wyndham franchisees by negotiating prices, volume discounts, and commissions for various products and services with third parties. SOF ¶ 14. One tool WSSI and Wyndham use to provide this support is the "Strategic Sourcing" program. *Id.* Under that program, WSSI enters into agreements with approved suppliers, who then offer their products to the franchisees. SOF ¶¶ 15-16. The agreements between Wyndham and the suppliers include terms regarding how the suppliers can communicate to the franchisees regarding their products. SOF ¶ 17. As Wyndham's Andrew Gattuso explained in an affidavit, "franchisees that provide [Wyndham] with their fax numbers want to receive communications by fax," and he is "not aware of any instance in which Gorss [Motels] informed [Wyndham] that it objected or did not want to receive a facsimile." SOF ¶¶ 21, 50. One approved method of communication under the Strategic Sourcing program was "fax blasts" targeted at the franchisee list. SOF ¶ 17.

AT&T participated in the Strategic Sourcing program as a Wyndham-approved supplier. SOF ¶¶ 19, 30, 33-34. Wyndham is a long-standing corporate client of AT&T's via an agreement with AT&T Mobility National Accounts, LLC. SOF ¶ 33. As part of AT&T's agreement with Wyndham, owners and employees of Wyndham's *franchises* can obtain a substantial discount on AT&T wireless service as "Qualified Partner Users" ("QPUs").[2] SOF ¶ 35. The contract between Wyndham and AT&T in place at the time the fax was sent also provides for AT&T's participation in the Strategic Sourcing program through engaging in the marketing of those offers towards the franchisees. SOF ¶ 30.

---

[2] The contract between AT&T and Wyndham also provides for discounts for "Corporate Responsible User" ("CRU") accounts (*i.e.*, traditional corporate accounts for which Wyndham has payment responsibility on) and Individual Responsible User ("IRU") accounts (*i.e.*, Wyndham employees who receive personal service from AT&T). SOF ¶ 34.

**D.     Gorss Motels Was Fully Informed About the Wyndham Strategic Sourcing Program and Its Approved Suppliers.**

As a Wyndham franchisee, Gorss Motels knew that it could participate in the Strategic Sourcing program to obtain goods and services to assist it in running its hotel. As part of the 1988 Agreement (and as a condition of opening the Super 8 in Cromwell), Gorss Motels agreed to follow Super 8's "System Standards" for supplying its hotel, including promising that it would "abide by the rules of operation, however denominated, as are from time to time adopted by [Super 8] and to furnish motel accommodations, services, and conveniences of the same high quality and distinguishing characteristics as provided at Super 8 Motels in and around the United States." SOF ¶ 22. Gorss Motels further "agree[d] to operate its motel at all times in strict compliance with the System [Standards]." *Id.* Gorss Motels thus knew from the start that part of its franchise relationship would involve entering agreements with suppliers, and it is only logical that such agreements would also involve receiving offers from those suppliers in some form.

The 2014 Franchise Agreement further documented Gorss Motels' and Wyndham's mutual obligations regarding marketing, including Gorss Motels' commitment to participate in the Wyndham marketing program. SOF ¶ 23. That 2014 Agreement also expressly addressed the Approved Supplier program:

> **4.4 Purchasing and Other Services.** We may offer optional assistance to you with purchasing items used at or in the Facility. Our affiliates may offer this service on our behalf. We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts. We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards.

SOF ¶ 24.

When it entered into the 2014 Franchise Agreement, Gorss also received Super 8's Franchise Disclosure Document ("FDD"). SOF ¶ 25. The FDD described WSSI as offering "goods and services to our franchisees and the franchisees of the Lodging Affiliates as defined

5

below. See Items 5 and 8." SOF ¶ 26. Item 8, in particular, describes the ongoing Approved

Supplier program as follows:

> To support the purchasing efforts of our franchisees, we and/or
> WSSI negotiate purchasing terms, including price, volume
> discounts and commissions on a range of products and services. In
> doing so, we and our affiliates seek to promote the overall interests
> of our lodging systems, our management company and our
> interests as franchisors. We and/or WSSI believe that the prices
> obtained through our products and services programs for
> franchisees are generally competitive because of our buying power
> and negotiated discounts with suppliers. We do not represent that
> pricing under any of these programs is the best available on a per
> item basis.
>
> In connection with this program, we and/or WSSI identify certain
> suppliers of products and services who are then designated as
> "Approved Suppliers". Under the Approved Supplier program,
> franchisees may purchase products and services directly from these
> Approved Suppliers through our electronic e-procurement system
> or through more traditional means.

SOF ¶ 27.

### E.   The January 2014 Fax.

In January 2014, Nancy Corelli oversaw AT&T's participation in the Wyndham

marketing program. SOF ¶ 36.[3] AT&T generally did not participate in fax broadcasts under the

program, opting instead to pursue other methods to communicate its discounts to Wyndham

franchisees. SOF ¶ 37. However, in January 2014, AT&T elected to send a fax and Ms. Corelli

worked with Wyndham and internal AT&T staff to prepare the necessary copy. SOF ¶ 38. At the

time, Ms. Corelli understood that AT&T had permission through Wyndham to contact the

customers. SOF ¶ 39.

Neither AT&T nor anyone hired by AT&T played any role in transmitting the fax.

Instead, the fax was transmitted on January 13, 2014 by vendors Wyndham generally contracted

with to do printing work (including sending faxes)—Western Printing and Westfax. SOF ¶¶ 41-

---

[3] A true and correct copy of the fax sent is attached as Exhibit A to the Amended Complaint.

42. Western Printing contracted with Wyndham to do printing on its behalf, including sending the fax at issue. SOF ¶ 41. Western Printing then subcontracted with Westfax to handle the actual fax transmission. SOF ¶ 42. Western Printing never charged AT&T for the fax or had any involvement with anyone from AT&T. SOF ¶ 43.

At the bottom of the fax, Wyndham included certain disclaimer language that a recipient can use to opt out of future faxes sent pursuant to the marketing program:

> This facsimile contains confidential information intended only for use by Wyndham Worldwide entitles and Wyndham Hotel Group franchisees. If the reader of this facsimilie is not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this facsimile is strictly prohibited. If you have this facsimile by error, please immediately notify us by emailing strategic.sourcing@wyn.com. To opt out from future faxes, email strategic.sourcing@wyn.com or call this toll-free number: (877) 764-4212.

SOF ¶ 44.

## F.    Gorss Motels Chooses To Accrue Additional TCPA Lawsuits.

Gorss Motels admittedly knew about the junk fax provisions of the TCPA for many years prior to receiving the January 13, 2014 fax. For example, its principal (Steven Gorss) testified that he learned about his eventual TCPA counsel from reviewing articles in trade magazines from as early as 2011 and began communicating with him at that time. SOF ¶ 48. But Gorss Motels never attempted to opt out of receiving faxes under the Wyndham Strategic Sourcing program. SOF ¶ 50. Instead of attempting to stop the faxes from Wyndham, Steven Gorss instead directed all the faxes he received from Wyndham to his attorneys. SOF ¶ 49. When he received the faxes, Mr. Gorss would not review the opt-out language or attempt to opt out. Instead, he would just "put [the fax] in a file." SOF ¶ 51.

Since selling its business in 2016, Gorss Motels' sole purpose is to file lawsuits. SOF ¶ 53. In fact, Gorss Motels is the named plaintiff in at least 20 "junk fax" class actions that make

the same basic allegations—that Gorss Motels and other Wyndham franchisees received unsolicited fax advertisements. SOF ¶ 52.

## STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing that there are no genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). However, the purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Thus, "only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251 (1986). And a mere scintilla of evidence in support of the non-moving party's position will not be sufficient to create a genuine dispute; there must instead be evidence from which the jury reasonably could find for the non-moving party. *Id.*

## ARGUMENT

I.     **AT&T Is Entitled To Summary Judgment Because The Fax Was Sent With Permission.**

A.     **Gorss Motels Provided Permission To Wyndham To Receive Faxes.**

The Court already found in its order regarding class certification (Dkt. No. 78) that the FCC's so-called "Solicited Fax Rule" (which purported to require even *solicited* faxes to contain an opt-out notice that strictly complied with the FCC's regulations) no longer binds this Court after the D.C. Circuit's decision in *Bais Yaakov of Spring Valley et al. v. FCC*, 852 F.3d 1078 (D.C. Cir. 2017).[4] The Second Circuit declined to consider Gorss Motels' challenge to that

---

[4] The FCC has since withdrawn the Solicited Fax Rule, recognizing that *Bais Yaakov* determined it exceeded its authority in issuing the rule. *See* Order, *Petitions for Reconsideration and/or Declaratory Ruling and Retroactive Wavier of 47 C.F.R. §64.1200(a)(5)(iv) Regarding the*

determination under Fed. R. Civ. P. 23(f). Dkt. No. 82. Since "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case," the applicability of the Solicited Fax Rule need not be relitigated on summary judgment. *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002).

With the Solicited Fax Rule held invalid, the question of whether a plaintiff has a valid claim under the junk fax provisions of the TCPA hinges on whether or not the fax was "solicited." *See Bais Yaakov*, 852 F.3d at 1082. If the fax is solicited (*i.e.*, if the recipient has provided "prior express invitation or permission" to receive the fax) that ends the matter, since a solicited fax advertisement does not violate the TCPA. *See* 47 U.S.C. § 227(a)(5) (defining unsolicited advertisement as one sent "without [the recipient's] prior express invitation or permission, whether in writing or otherwise").

Determining whether a recipient of a fax provided "prior express invitation or permission" is not simply a matter of looking for "magic words." *Safemark*, 931 F.3d at 1101. Instead, whether permission exists is context specific and depends on whether a "consumer [would] understand that by providing a fax number, he or she is agreeing to receive faxed advertisements." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 68 Fed. Reg. 44144, 44168 (FCC July 25, 2003). Under this standard, if a potential plaintiff voluntarily provided its fax number in a commercial context with the understanding that it will then receive faxed advertisements, the plaintiff has provided express permission and has no claim. *See, e.g., Practice Mgm't Support Servs. Inv. v. Appeal Sols., Inc.*, 2010 WL 748170, at *3 (N.D. Ill. Mar. 1, 2010) ("[W]e find that plaintiff's voluntary communication of its fax

---

*Commission's Opt-Out Notice Requirements for Faxes Sent with the Recipient's Prior Express Permission,* 33 FCC Rcd, 11179, 11179 (Nov. 14, 2018). The order withdrawing the rule has since been published in the Federal Register. *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991: Regarding the Commission's Opt-Out Notice Requirement for Faxes Sent With the Recipient's Prior Express Permission*, 84 Fed. Reg. 10266, 10266 (FCC Mar. 20, 2019).

number precludes [plaintiff] from asserting that the faxes were unsolicited under the TCPA");
*see also Landsman & Funk, P.C. v. Lorman Bus. Ctr., Inc.*, 2009 WL 602019, at *2 (W.D. Wis.
Mar. 9, 2009) ("By sending its fax number to defendant, plaintiff cannot assert that the fax
advertisements it received from defendant were 'unsolicited', so as to fall within the category of
fax advertisements regulated under 47 U.S.C § 227.").

Gorss Motels voluntarily provided its fax number to Wyndham for inclusion in the
franchise directory by, among other things, listing its number on the contact form returned to
Wyndham. SOF ¶ 6. Gorss Motels' communications with Wyndham (including providing its
number) must be viewed against the backdrop of its long-running franchise relationship with
Wyndham. An important element of that relationship for the entire time it was in place was that
Wyndham required Gorss Motels to meet its System Standards, which necessarily involved
offering products from suppliers for the franchisees to use in the course of its franchise business.
SOF ¶ 22.

The 2014 Agreement and related FDD (which were entered into just after Gorss Motels
received the fax from AT&T) shed more light regarding the expectations of Wyndham and Gorss
as it relates to the approved supplier program. Those documents show that Gorss Motels
acknowledged and agreed to continue participating in that program. In the 2014 Agreement,
Gorss Motels agreed that "[Wyndham] may offer optional assistance to you with purchasing
items used at or in the Facility. Our affiliates may offer this service on our behalf." SOF ¶ 24.
Likewise, the FDD that Gorss Motels signed in 2014 made clear that Wyndham would send
marketing information to its franchisees in order to take advantage of discounts and deals made
available through its status as a franchisee. SOF ¶¶ 26-28.

The Eleventh Circuit recently found that Gorss Motels' participation in the supplier
program constituted express permission. *Safemark*, 931 F.3d at 1100-02. Among the faxes at

issue in that case were faxes sent to Gorss Motels in 2013. *Id.* at 1097-98. The court found that the franchise agreements constituted express permission to receive the faxes because the agreements "contemplated that the hotels could receive optional assistance with purchasing items from Wyndham and its affiliates." *Id.* at 1101. A "reasonable consumer" would thus understand that "assistance with purchasing items entails receiving information about buying products." *Id.*

Principles of collateral estoppel also call for adopting the holding in the *Safemark* case. For collateral estoppel to apply, "(1) the issues in both proceedings must be identical, (2) the issue in the prior proceeding must have been actually litigated and actually decided, (3) there must have been a full and fair opportunity for litigation in the prior proceeding, and (4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits." *Faulkner v. National Geographic Enters. Inc.,* 409 F.3d 26, 37 (2d Cir. 2005). Each of these four factors is met here. Both the trial court and Eleventh Circuit squarely addressed the issue of whether Gorss Motels gave permission to receive faxes under the Wyndham approved supplier program—the same central question at issue here. Gorss Motels fully briefed and presented its arguments in that case on a full record, both in the trial court and on appeal. A final judgment was eventually issued, from which an appeal was taken.[5] Gorss Motels, then, is foreclosed from taking a second bite at the apple and re-litigating the same matter in this court.

## II.    Even If The Fax At Issue Was Unsolicited, AT&T Is Entitled To Summary Judgment.

Even if the January 2014 fax was unsolicited (or, in the alternative, if that question poses issues of fact that must be left for the jury to decide), Gorss Motels' TCPA claim still fails because it had an existing business relationship ("EBR") with *both* Wyndham and AT&T. Under the TCPA, even unsolicited faxes are not actionable if (1) there is an EBR, (2) the fax number was received through a voluntary communication of the fax number or from a directory, and (3)

---

[5] Gorss Motels has petitioned for *en banc* review of the appellate decision.

the fax informs the recipient of the ability and means to avoid future unsolicited advertisements. 47 U.S.C. §227(b)(1)(C)(i)-(iii); 47 CFR § 64.1200(a)(4)(i)-(iii). The fax at issue meets each of those requirements.

### A.    Gorss Motels Had an EBR With Both Wyndham and AT&T.

*First,* Gorss Motels had an EBR with both Wyndham and AT&T. Under the TCPA, an EBR includes any "prior or existing relationship formed by a voluntary two-way communication between a person or entity and a business . . . with or without an exchange of consideration, on the basis of an inquiry, application, purchase or transaction by the business . . . regarding products or services offered by such person or entity, which relationship has not been previously terminated by either party." 47 C.F.R. § 64.1200(f)(6). "Once established, the EBR will permit an entity to send facsimile advertisements to a business or residential subscriber until the subscriber terminates it by making a request not to receive future faxes." *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order and Third Order on Reconsideration, 21 F.C.C. Rcd. 3787, ¶ 19 (April 6, 2006). The definition "clearly contemplates that the EBR could be formed by any of the following: an inquiry, application, purchase or transaction by the business." *Id.*

It is hard to imagine a more paradigmatic example of an EBR than Gorss Motels and Wyndham's two-and-a-half-decade franchise relationship. SOF ¶¶ 4-5, 10. This suffices to meet the first prong of the test for the EBR defense because the fax itself clearly came from Wyndham. The fax identifies a Wyndham fax number the opt out refers recipients to a Wyndham email, the faxes are directed at Wyndham franchisees because of their relationships with Wyndham, and the contents of the fax refer to an offer under the Wyndham strategic sourcing program. SOF ¶ 44, *see generally* Comp. Ex. A. Wyndham is allowed to use its EBR to communicate with its franchisee regarding matters directly related to their franchise arrangement, such as the supplier program.

12

But, assuming *arguendo* that Wyndham's involvement in sending the fax (and the fax's close relationship to the Wyndham/Gorss Motels franchise agreement) is not enough to establish an EBR, AT&T has its own separate EBR with Gorss Motels. Gorss Motels received its local telephone and fax services via the Southern New England Telephone Company ("SNET"). SOF ¶ 45. At the time the fax was sent, SNET was affiliated with AT&T. SOF ¶ 46. And Gorss Motels principal testified that he understood he received the service from "AT&T," creating an EBR with the AT&T family of companies.

### B.   Gorss Motels Provided and Published Its Fax Number.

The second requirement of the EBR defense is also satisfied, because Gorss Motels voluntarily provided its fax number directly to Wyndham and published its fax number in Wyndham's directory. A party may rely on an EBR if it obtained the number of the fax machine via:

> (A) The voluntary communication of such number by the recipient directly to the sender, within the context of such established business relationship; or
>
> (B) A directory, advertisement or site on the Internet to which the recipient voluntarily agreed to make available its facsimile number for public distribution.

47 C.F.R. § 64.1200(a)(4)(ii)(A)-(B). The FCC has further stated that "it would be permissible for the sender to fax an advertisement to a recipient that had provided a facsimile number to the sender, for example, on an . . . information request . . . It also would be permissible for the recipient to provide to the sender its facsimile number orally over the telephone. . . ." *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order and Third Order on Reconsideration, 21 F.C.C. Rcd. 3787, ¶ 14 (April 6, 2006).

As described above, Gorss Motels voluntarily provided its fax number directly to Wyndham within the context of its franchise relationship with Wyndham, therefore satisfying 47

13

C.F.R. § 64.1200(a)(4)(ii)(A). Additionally, Gorss Motels made its fax number available for inclusion in the franchise directory (which was distributed to the public, including on the Internet). SOF ¶¶ 11-12; *see* 47 C.F.R. § 64.1200(a)(4)(ii)(B). And it was Gorss Motels' inclusion in the publicly available franchise directory provided by Wyndham to the approved suppliers that led to it receiving the fax at issue. SOF ¶ 31-32; 40. Thus, the second prong of the test for permissible unsolicited faxes is satisfied.

### C.     The Fax Contained Sufficient Opt Out Language.

Finally, the fax sent to Gorss Motels contained opt-out language that informed the recipient of the ability and means to avoid future unsolicited advertisements by providing an email address to Wyndham's Strategic Sourcing program and a toll-free number by which the recipient could submit a request not to receive faxes in the future. The relevant language is set below:

> This facsimile contains confidential information intended only for use by Wyndham Worldwide entitles and Wyndham Hotel Group franchisees. If the reader of this facsimilie is not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this facsimile is strictly prohibited. If you have this facsimile by error, please immediately notify us by emailing strategic.sourcing@wyn.com. To opt out from future faxes, email strategic.sourcing@wyn.com or call this toll-free number: (877) 764-4212.

SOF ¶ 44. The notice thus both informs the recipient that it can opt-out, and gives it an easy method to do so via email or the phone.

Gorss claims this language does not comply with the FCC's technical regulations because it (1) did not include a fax number for opt outs to respond to, (2) was not "clear and conspicuous,"[6] (3) did not state that the sender must honor a request to opt out within a

---

[6] The notice is featured prominently at the bottom of the first (and only) page of the fax, so this argument is not well-founded.

reasonable time as a matter of law, and (4) did not set forth the legal requirements for a request, including that the recipient identify the fax number to which the request relates. But Gorss Motels does not dispute that the opt-out notice is substantially compliant, nor can it demonstrate that the notice failed to "inform[] the recipient of the ability and means to avoid future unsolicited advertisements." 47 C.F.R. § 64.1200(a)(4)(iii). That ought to end the matter. The opt out notice included in the fax is functionally equivalent to what is required under the FCC's technical regulations and, since a plaintiff should not be able to defeat the defense by engaging in a "game of semantics," judgment is appropriately entered for AT&T. *Landsmen & Funk P.C. v. Lorman Business Center,* 2009 WL 602019, at * 7 (W.D. Wisc. Mar. 9, 2009).

To the extent this Court disagrees with *Landsmen & Funk* and finds that minor technical defects prevent AT&T from complying with the third prong of the defense, summary judgment would still be appropriate. Like all plaintiffs, Gorss Motels must show that it meets the requirements of Article III standing at all phases of the litigation in order to maintain a claim. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992) (standing is "an indispensable part of the plaintiff's case" that must be supported with "the manner and degree of evidence required at the successive stages of the litigation."). To establish Article III standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo Inc. v. Robins,* 136 S.Ct. 1540, 1547 (May 16, 2016).

In ruling on AT&T's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court found that Gorss Motels sufficiently alleged that it been injured by receiving the fax (including through the loss of printer and toner, the loss of time, and an invasion of privacy) and thus met the first prong of the *Spokeo* test. Dkt. No. 52 at 8-10. But review of the full record established by discovery shows that Gorss Motels cannot meet the *second* element of the *Spokeo* test—

showing that the injury is "fairly traceable" to the conduct complained of. When an opt-out notice clearly communicates the "means and opportunity to opt-out," any injury caused by receiving the fax (or by receiving future faxes) cannot be attributed to some technical deficiencies in the opt-out notice. *St. Louis Heart Ctr. Inc. v. Nomax*, 899 F.3d 500, 504-05 (8th Cir. 2018); *Craftwood Lumber Co. v. Horizon Glob. Corp.*, 2018 WL 6920394, at **3-4 (N.D. Ill. Apr. 12, 2018).

Here, the fax provides a clear method to opt out. But Gorss Motels did not take advantage of that method, and the record makes clear that it would not have, even if the opt-out notice strictly complied with the FCC's regulations. Gorss Motels' principal has testified that he did not review the opt-out notice with any particularity. SOF ¶ 51. On the contrary, he simply sent *all* of the faxes he received to his counsel to horde for additional lawsuits. SOF ¶¶ 49, 51. Gorss Motels, then, would be in exactly the same position if Wyndham had sent a fax that strictly complied with the requirements of CFR § 64.1200(a)(4)(iii). There is thus no "casual nexus" between the allegedly deficient opt-out notice and Gorss Motels' claimed injury, and the claimed injury in receiving the fax is not fairly traceable to any regulatory violation. *Rothstein v. UBS AG,* 708 F.3d 82, 91 (2d Cir. 2013); *see also Liberty Glob Logistics LLC v. U.S. Mar Admin.*, 2014 WL 4388587, at *6 n.3 (E.D.N.Y. Sept. 5, 2014) (no standing when the challenged conduct "changed nothing" from the status quo); *McNamara v. City of Chicago*, 138 F.3d 1219, 1221 (7th Cir. 1998) ("[a] plaintiff who would have been no better off had the defendant refrained from the unlawful acts of which the plaintiff is complaining does not have standing[.]").

## III.   Gorss Motels Is Not in the TCPA's Zone of Interest and Thus Lacks Statutory Standing.

To have standing, a plaintiff must show that the claim falls within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.* 454 U.S. 464, 475

(1982). The zone of interest test "denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Stoops v. Wells Fargo Bank, N.A.,* 197 F.Supp.3d 782, 804 (W.D. Pa. 2016) (finding TCPA claim outside of the zone of interest where plaintiff purchased cell phone specifically with the intention of receiving calls in order to pursue TCPA lawsuits). Thus, in assessing whether a plaintiff is within the statute's zone of interest, courts (1) discern the interests sought to be protected by the statute at issue, and (2) inquire whether the plaintiff's interests are among them.

### A.    The TCPA Exists to Allow Consumers to Protect and Vindicate Their Privacy Rights.

To determine a statute's "zone of interest," courts first look to the substantive provision of law that the plaintiff claims has been violated. *See Lujan,* 497 U.S. 871, 883 (1992). In light of the TCPA's text, courts have identified "individual privacy rights, public safety interests, and interstate commerce" as interests protected by the TCPA. *See Tel. Sci. Corp. v. Asset Recovery Sols., LLC,* 2016 WL 4179150, at *12 (N.D. Ill. Aug. 8, 2016). In passing the junk fax provisions of the TCPA specifically, Congress aimed to protect "consumers [who] felt besieged by unsolicited faxes . . . despite [their] asking to be removed from senders fax lists." S. Rept. 109-76 (2005) (internal quotations omitted). Regulators hoped not only to curb "the burden of . . . paying for the cost of paper and toner, but also the opportunity costs of time spent reading and disposing of faxes, the time the machine is printing an advertisement and is not operational for other purposes, and the intrusiveness of faxes transmitted at inconvenient times, including the middle of the night." *Id.*

The statute's legislative history thus confirms that the purpose of the TCPA's junk fax provision is to allow for the effective vindication of privacy rights by giving individuals *control* over the faxes they receive and the ability to stop receiving unwanted faxes. What the law was

17

not designed for was to allow a professional plaintiff to turn ordinary communications received in the course of its long-standing business relationship into a litigation factory based on technicalities. *See Stoops*, 197 F. Supp. 3d at 805 (internal quotations omitted); *See also Tel. Sci. Corp. v. Asset Recovery Solutions, LLC*, 2016 WL 4179150, at *15-16 (N.D. Ill. Aug. 8, 2016) (dismissing TCPA case because plaintiff does not fall within the TCPA's zone of interest where plaintiff operated technology that detected robocalls and purposefully answered those calls to incur damages).

### B.     Gorss Motels Does Not Fall Within the TCPA's Zone of Interests.

Gorss Motels does not fall within the zone of interests protected by the TCPA because it made no attempt to vindicate its privacy rights. To the contrary, it courted additional faxes made under the approved supplier program. Gorss Motels entered into an arrangement with its attorneys years before filing this lawsuit and began sending them the faxes they received as part of the Wyndham supplier program. SOF ¶ 49. When he received the faxes under the supplier program, Gorss Motels' principal, Steven Gorss, confirmed that he would simply put them in a file to be mailed to his attorney, and not specifically review the faxes. SOF ¶ 51.

Neither Gorss Motels nor its attorneys ever took any steps to stop the faxes. SOF ¶ 50. The fax sent by Wyndham contained both an email address and a telephone number that Gorss Motels could use to stop faxes under the supplier program. SOF ¶ 44. Nobody at Gorss Motels, however, ever utilized those contacts. SOF ¶ 50. Instead, Gorss Motels continued to provide its fax number as a contact number to Wyndham.[7] SOF ¶¶ 7-10.

---

[7] This specific issue challenging Gorss Motels' standing has been raised in other cases, but so far Gorss Motels has carefully avoided a ruling. In *Gorss Motels Inc., v. Cetis, Inc.*, 3:16-cv-01368-RNC, Judge Chatigny requested that the parties submit supplemental briefs on the "zone of interest" issue. Judge Chatigny questioned "whether a plaintiff like this [] was meant to have a cause of action under this statute" in a case involving similar claims involving the Wyndham supplier program. The court went on to question whether the TCPA was meant to address "the problem of the plaintiff who is delighted to receive the fax because counsel is available to sue and it's a very nice way of making money." 7:17-20, *see also id.* at 3:9-11 ("I have difficulty

18

**IV.    At a Minimum, Gorss Motels' Claim For Treble Damages Should Be Stricken.**

For the reasons set forth above, AT&T did not violate the TCPA and summary judgment should be granted on the entire complaint. However, assuming *arguendo* that the case could proceed to trial on the underlying TCPA claims, Gorss Motels' claim for treble damages should nevertheless be stricken.

The TCPA only permits treble damages for violations that are made "willfully or knowingly." *See* 47 U.S.C. § 227(b)(3) ("If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph."). To seek treble damage under the TCPA, a plaintiff must thus show intent—that is to say, that the defendant engaged in the wrongful conduct "knowingly." *See Lart v. Trinity Physician Fin. & Ins. Servs.,* 780 F.3d 1101, 1007 (11th Cir. 2015) ("If we interpreted the statute to require only that the violator knew he was making a call or sending a fax, the statute would have almost no room for violations that are not 'willful [] or knowing[]'"); *see also Haysbert v. Navient Solutions, Inc.,* 2016 WL 890297, at *10 (C.D. Cal. Mar. 8, 2016) ("The Court agrees with those that have held the statute requires a defendant to intend or know that it was performing each of the elements of a TCPA claim (*i.e.,*

grasping whether in fact Congress did intend that the plaintiff be able to sue under statute"); *Id* at 3-8 (questioning whether "it was Congress's intention that rather than rely on the motel to call the telephone number of its authorized supplier or send an email to the authorized supplier, it would be better if the motel didn't do that and sent [the document] to its counsel in anticipation of filing a potentially lucrative lawsuit") (transcript attached hereto as Exhibit 1). Shortly after Judge Chatigny raised these issues at the hearing, Gorss Motels voluntarily dismissed their suit with prejudice. *See Gorss Motels, Inc., v. Cetis, Inc.* No. 16-1368 (D. Conn. June 18, 2018), Dkt. No. 113. Similarly, after this issue was briefed in *Gorss Motels Inc. v. Sysco Guest Supply, LLC,* 3:16-cv-01911-VLB, the case settled. *Id.* at Dkt. 99. However, the issue remains pending before a number of courts in this district, including *Gorss Motels Inc. v. Otis Elevator Company et al.,* No. 3:16-cv-01781-VAB (Dkt. No. 65); *Gorss Motels Inc. v. Sprint Solutions, Inc.,* Case No. 3:17-cv-00546-JAM (Dkt. No. 64) and *Gorss Motels Inc. v. Ilen Products Ltd.,* No. 3:18-cv-01052-AVC (Dkt. No. 19).

that it was making a call, to a person who did not provide prior express consent, using an automated system).").

The undisputed facts show that AT&T did not have any knowledge of any purported TCPA violation. Wyndham has testified that AT&T had its permission to contact the franchisees and AT&T's witnesses testified they understood that Wyndham had the franchisees' permission to receive the faxes. SOF ¶¶ 17, 39. That alone ought to preclude treble damages. *See Lary,* 780 F.3d at 1107 (dismissing claims for trebled damages because 'although [plaintiff] alleged that [defendant] 'us[ed] or caus[ed] others to use a . . . device to send' an unsolicited advertisement to [plaintiff's] fax machine, he failed to allege that [defendant] knew the advertisement was unsolicited.").

Moreover, there is no evidence of any communication from Gorss Motels to Wyndham or AT&T indicating it objected to receiving the fax advertising a potential discount for AT&T services—or even that it objected to prior faxes sent under the supplier program advertising other products and services provided under the program. SOF ¶ 50. In the absence of notice that Gorss Motels had not given its permission to receive the fax, AT&T cannot be found to have violated the statute willfully or knowingly. *See, e.g., Harris v. World Fin. Network Nat'l Bank*, 867 F.Supp.2d 888, 895 (E.D. Mich. 2012) ("In order for Plaintiff to prove that Defendants knew that they acted in a manner that violated the statute (regardless of if Defendants actually knew that they were violating the statue), Plaintiff must also show that Defendants knew that Plaintiff did not consent to the phone calls."); *Adamcik v. Credit Control Servs., Inc.*, 832 F. Supp. 2d 744, 755 (W.D. Tex. 2011) (granting partial summary judgment in defendant's favor on TCPA trebled damages claim, given that "there was no evidence CCS knowingly disregarded Adamcik's revocation of consent, nor was there any evidence CCS knew or should have known it was violating the TCPA"); *Warnick v. DISH Network, LLC*, 2014 WL 12537066, at *17 (D. Colo.

Sept. 30, 2014) (granting partial summary judgment to defendant on claims of trebled TCPA damages where plaintiff "never alerted DISH that its calls were improper" and thus defendant's calls were not made in willful or knowing violation of the TCPA).

And finally, even if the Court concluded that the TCPA can be violated without an intent to engage in wrongful conduct, Gorss' hands are so unclean that the Court would have discretion not to award additional damages.

## CONCLUSION

For the reasons set forth above, summary judgment is warranted. Judgment should be entered in AT&T's favor, and plaintiff should take nothing by virtue of its complaint.

Dated: September 3, 2019

Respectfully Submitted,

/s/ Hans J. Germann
Hans J. Germann (*pro hac vice*)
Kyle J. Steinmetz (*pro hac vice*)
Mayer Brown LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600 (Tel.)
(312) 701-7711 (Fax)
hgermann@mayerbrown.com
ksteinmetz@mayerbrown.com

Timothy P. Jensen (ct18888)
O'SULLIVAN McCORMACK, JENSEN
& BLISS PC
100 Great Meadow Road
Wethersfield, CT 06109
Telephone: 860-258-1993
Fax: 860-258-1991
Email: tjensen@omjblaw.com

*Counsel for Defendant*

**<u>CERTIFICATE OF SERVICE</u>**

I, Hans J. Germann, an attorney, do hereby certify that on September 3, 2019, I caused a copy of the foregoing to be served via the ECF system:

Brian J. Wanca
Ryan M. Kelly
ANDERSON + WANCA
3701 Algonquin Road, Suite 500
Rolling Meadows, IL 60008
Telephone: 847/368-1500
bwanca@andersonwanca.com
rkelly@andersonwanca.com

Aytan Y. Bellin
BELLIN & ASSOCIATES
85 Miles Avenue
White Plains, NY 10606
Telephone: 914/345-5345
aytan.bellin@bellinlaw.com

/s/ Hans J. Germann
Hans J. Germann

22