UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Gorss Motels, Inc.,<br>        *Plaintiff*,<br>                    *v.*<br>AT&T Mobility, LLC & AT&T Mobility National Accounts, LLC,<br>        *Defendants*. | Civil No. 3:17-cv-403 (JBA)<br><br>September 22, 2020 |

**RULING ON PLAINTIFF'S AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Gorss Motels, Inc. ("Gorss")[1] brings a claim against Defendants AT&T Mobility, LLC and AT&T Mobility National Accounts, LLC (together, "AT&T") for violation of the Telephone Consumer Protection Act of 1991 ("TCPA"), as amended by the Junk Fax Prevention Act of 2005 ("JFPA"), by sending an impermissible fax advertisement on January 13, 2014. Both Plaintiff and Defendants separately move for summary judgment in their favor. Oral argument on the parties' motions was held on August 14, 2020. For the reasons that follow, Defendants' Motion for Summary Judgment is granted in part and denied in part, and Plaintiff's Motion for Summary Judgment is denied.

**I.   Background**

Plaintiff Gorss Motels, Inc. entered into a twenty-year franchise agreement with Super 8 Motels, Inc. in October 1988 ("1988 Franchise Agreement") to operate a hotel in Cromwell, Connecticut. (Parties' L.R. Stmts. [Docs. ## 91, 99-1] ¶ 4; Ex. C (1988 Franchise Agreement) to Pl.'s Opp. to Defs.' Mot. for Summ. J. [Doc. # 99-3].) In March 2009, Gorss and Super 8

---

[1] Plaintiff brought this action individually and as a representative of a proposed class, but the Court denied its motion for class certification in February 2019, concluding that common questions of fact would not predominate over individual questions—specifically, whether individual members of the proposed class had consented to receive the faxes at issue. (Ruling Denying Mot. for Class Cert. [Doc. # 78].)

Motels amended the 1988 Franchise Agreement to extend its term to August 15, 2014 ("2009 Amendment"). (Parties' L.R. Stmts. ¶ 5; Ex. D (2009 Amendment) to Pl.'s Opp. to Defs.' Mot. for Summ. J. [Doc. # 99-3].) In September 2014, Gorss and Super 8 Motels entered into a new twenty-year franchise agreement ("2014 Franchise Agreement"). (Parties' L.R. Stmts. ¶ 10; Ex. E (2014 Franchise Agreement) to Pl.'s Opp. to Defs.' Mot. for Summ. J. [Doc. # 99-3].) In September 2014, Gorss and Super 8 Motels entered into a new twenty-year franchise agreement ("2014 Franchise Agreement"). (Parties' L.R. Stmts. ¶ 10; Ex. E (2014 Franchise Agreement) to Pl.'s Opp. to Defs.' Mot. for Summ. J. [Doc. # 99-3].) Wyndham Hotel Group ("Wyndham") is a hotel franchise corporation which operates the Super 8 franchise. (Parties' L.R. Stmts. ¶¶ 1-2.)

The 1988 Franchise Agreement required Gorss to "furnish motel accommodations, services and conveniences of the same high quality and distinguishing characteristics as provided at Super 8 Motels in and around the United States." (1988 Franchise Agreement at 3.) Under that agreement, Gorss was also required to "operate its motel at all times in strict compliance with the System," defined as the "plan or system" "developed and perfected" by Super 8 Motels, Inc. "for providing to the general public, and especially to the motoring public, a motel service, including lodging and other accommodations of a distinctive nature, of high quality and of other distinguishing characteristics." (*Id.* at 2-3.) The agreement also required Gorss to follow "the specifications and quality of items of personal property to be used in the franchised motel . . . established by" Super 8 Motels. (*Id.* at 8.) Gorss agreed "to purchase from [Super 8], or from any other source whose supplies and equipment have been approved in writing," certain enumerated items. (*Id.*) The 1988 Franchise Agreement did not include any language explicitly discussing the sending of advertisements by approved suppliers to the franchisee, either by facsimile or otherwise, nor did it include mention of Gorss's fax number. (*See generally id.*)

The 2014 Franchise Agreement, which Gorss signed approximately eight months after receiving the Fax, included additional information and requirements regarding Wyndham marketing, approved supplier programs, and the System Standards. Specifically, that agreement provided:

> **4.4. Purchasing and Other Services.** We may offer optional assistance to you with purchasing items used at or in the Facility. Our affiliates may offer this service on our behalf. We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service, or obtain volume discounts. We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards.

(2014 Franchise Agreement § 4.4.) At the time of the 2014 Franchise Agreement, Gorss also received a Franchise Disclosure Document, which further described the required facility specifications and the approved suppliers program. (Parties' L.R. Stmts. ¶¶ 25-29.)

In January 2010, Gorss returned to Super 8 a completed Site Contact Form, on which Gorss listed its fax number, along with other contact information. (*Id.* ¶ 6; Ex. C (Site Contact Form) to Ex. 1 (Fenimore Decl.) to Defs.' Mot. for Summ. J. [Doc. # 94-1].) The Site Contact Form includes the "Wyndham Hotel Group" logo at the top. (Site Contact Form.) The Form indicates the "contact information currently recorded in our system" and asks franchisees to "[p]lease review and if there are any revisions, enter the updates on the right" side of the form. (*Id.*) The Site Contact Form asks for the name, address, phone number, fax number, and email address of both the "Entity Principal Contact" and the "Site Principal Contact." (*Id.*) Steven Gorss, the principal of Plaintiff Gorss Motels, Inc., completed the Site Contact Form for Plaintiff. (*Id.*) The fax number at issue was already listed under "Current Contact Information." (*Id.*) Mr. Gorss added an email address but made no other changes to the existing contact information. (*Id.*) The Site Contact Form states that "[u]pon receipt" of the completed form, "we will update our database" but includes no additional information about the intended use of the requested contact information and makes no mention of any

advertising services. (*Id.*) That fax number was also published in Super 8 Motel directories. (Parties' L.R. Stmts. ¶ 11.)

Wyndham participates in a marketing program through its wholly-owned subsidiary, Worldwide Sourcing Solutions, Inc. ("WSSI"). (*Id.* ¶ 14.) WSSI "supports the purchasing efforts of franchisees of Wyndham properties by negotiating process, volume discounts, and commissions for various products and services with third parties" through a program they refer to as "Strategic Sourcing." (*Id.*) Through that program, WSSI "often entered into agreements with suppliers whose goods and services would be offered to Wyndham properties as part of the benefits of being a Wyndham franchise." (*Id.* ¶ 15.) "The Strategic Sourcing program exists in part to aid the franchisees in obtaining appropriate supplies that meet the requirements of Wyndham's System Standards, as required in each brand's franchise agreements." (*Id.* ¶ 16.) Through the Strategic Sourcing program, suppliers have "the opportunity to participate in marketing programs that are directed at Wyndham's franchises, including a program through which WSSI arranges for a third party to send faxes" to franchisees. (*Id.* ¶ 17.)

AT&T participated in Wyndham's Strategic Sourcing program as an approved supplier and participated in the associated marketing program. (*Id.* ¶¶ 19, 30.) As part of that program, Wyndham provided to AT&T a corporate directory which included franchise contact information. (*Id.* ¶ 31.) Through the relationship between Wyndham and AT&T, certain discounts were available to Wyndham-affiliated entities, including Super 8 franchises. (*Id.* ¶ 34.)

In January 2014, AT&T sent a fax advertisement ("the Fax") to certain Wyndham franchisees, including the Super 8 Motel operated by Plaintiff. (*Id.* ¶¶ 36-38.) AT&T used an outside vendor, Western Printing, to process and send the fax, and Western Printing outsourced the fax to another company, WestFax. (*Id.* ¶¶ 41-42.) The Fax prominently features the AT&T logo at the top and begins: "Attention Wyndham Hotel Group owners and

4

hotel employees: Enjoy your 2014 Wyndham Hotel Group benefits!" (Ex. A (The Fax) to Am.
Compl. [Doc. # 39-1].) The Fax advertises certain credits and rebates for the purchase of new
items and service plans. (*Id.*) At the bottom of the Fax, in font noticeably smaller than the rest
of the page, there is some opt-out language:

> This facsimile contains confidential information intended only for use by
> Wyndham Worldwide entities and Wyndham Hotel Group franchisees. If the
> reader of this facsimile is not the intended recipient or the employee or agent
> responsible for delivering it to the intended recipient, you are hereby notified
> that any dissemination or copying of this facsimile is strictly prohibited. If you
> have received this facsimile by error, please immediately notify us by emailing
> strategic.sourcing@wyn.com.   To opt out from future faxes, email
> strategic.sourcing@wyn.com or call this toll-free number: (877) 764-4212.

(*Id.*) The text in this portion of the Fax is somewhat difficult to read in light of its size and the
quality of the Fax itself. (*See id.*) In particular, the punctuation in the email address listed and
the numerals of the toll-free phone number are difficult to discern. (*See id.*) In response to
the Fax, Plaintiff did not make any effort to opt out of receiving future faxes but rather sent
any fax advertisements it received directly to its legal counsel without reviewing the opt-out
language. (Parties' L.R. Stmts. ¶¶ 49-51.) Plaintiff has since filed "over 20" junk fax cases
against suppliers from the Wyndham program. (*Id.* ¶ 52.)

## II. Discussion

### A. Legal Standard

Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing]
all permissible factual inferences in favor of the party against whom summary judgment is
sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there
is no genuine dispute as to any material fact and the movant is entitled to judgment as a
matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the
evidence is such that a reasonable [finder of fact] could return a verdict for the nonmoving
party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (internal

quotations omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

"The moving party bears the initial burden of showing why it is entitled to summary judgment." *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Where . . . the nonmovant bears the burden of proof at trial, the movant may show prima facie entitlement to summary judgment in one of two ways: (1) the movant may point to evidence that negates its opponent's claims or (2) the movant may identify those portions of its opponent's evidence that demonstrate the absence of a genuine issue of material fact, a tactic that requires identifying evidentiary insufficiency and not simply denying the opponent's pleadings." *Id.* at 272–73 (citing *Celotex*, 477 U.S. at 323). "If the movant makes this showing in either manner, the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Id.* citing (Fed.R.Civ.P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "Like the movant, the nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Id.* (citing *Celotex*, 477 U.S. at 324; *Matsushita*, 475 U.S. at 586).

The same standard applies here, where the parties filed cross-motions for summary judgment. *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Id.*

## B. Parties' Motions for Summary Judgment

The Telephone Consumer Protection Act of 1991, as amended by the Junk Fax Prevention Act of 2005, makes it unlawful to "use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement." 47 U.S.C. § 227(b)(1)(C). The Federal Communications Commission has authority to prescribe regulations implementing the prohibition of unsolicited faxes. *See id.* § 227(b)(2). The TCPA creates a private right of action for violations of the Act or the "regulations prescribed under" the Act, and provides for statutory damages in the amount of $500 for each violation, injunctive relief against future violations, and treble damages if the Court finds the defendant "willfully or knowingly" violated the Act. *Id.* § 227(b)(3).

Plaintiff and Defendants each move for summary judgment. Defendants argue that summary judgment in their favor is proper for three reasons: 1) Plaintiff is a "professional plaintiff" who is not within the "zone of interest" intended to be protected by the JFPA, and thus lacks standing to pursue its claim; 2) "through its franchise relationship with Wyndham Hotel Group . . . Gorss Motels, gave its permission to receive faxes like the one at issue," and thus the Fax was not prohibited by the TCPA; 3) in the alternative, if the Court finds that the Fax was not solicited, then it falls within the "established business relationship" ("EBR") exception to the JFPA's prohibition of unsolicited faxes. (Defs.' Mot. for Summ. J. [Doc. # 90] at 1-2.) Defendants also argue that "because AT&T understood it had permission to fax Wyndham's franchisees, it did not violate the TCPA knowingly or willfully and thus Gorss Motels' claim for damages must be stricken." (*Id.* at 2.)

Plaintiff argues that summary judgment in its favor is proper because it has demonstrated, based on the undisputed facts in the record, that all elements of its claim are met. (Pl.'s Mot. for Summ. J. [Doc. # 93] at 1-2.)[2] Plaintiff argues further that summary

---

[2] Defendants do not oppose Plaintiff's argument that three of the basic elements of a TCPA/JFPA claim are met – that the Fax was an "advertisement" under the CPA and was sent to Plaintiff's "telephone facsimile machine" using a "telephone facsimile machine, computer,

judgment is proper because Defendants cannot meet their burden to demonstrate that Plaintiff provided prior express permission for the Fax or that the "established business relationship" exception applies. (*Id.*)

The Court will preliminarily address Defendants' claim on standing. The Court will then address the parties' overlapping questions of law regarding whether the Plaintiff provided "prior express invitation or permission to receive the Fax and whether the "established business relationship" exception applies to the Fax. Finally, the Court will address Defendants' contention regarding treble damages.

### C. Standing

Defendants' preliminary ground for summary judgment claims that Plaintiff has no standing to sue under the TCPA or the JFPA. To have standing, a plaintiff's complaint must "fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 475 (1982) (internal quotation omitted). In other words, Plaintiff's interests must be "among the *sorts* of interests that [the statutes] are designed to protect." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 886 (1990) (emphasis in original). "Whether a plaintiff comes within the zone of interests is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014) (internal quotations omitted).[3]

---

or other device," and that AT&T was the "sender" of the Fax – and the Court agrees that in light of the undisputed evidence in the record, they do plainly appear to be met. Thus, this ruling does not discuss these elements in detail.

[3] Defendants also assert that Plaintiff lacks standing because the alleged injury is not fairly traceable to the challenged conduct. The Court addresses this argument *infra* at 18-19.

The parties dispute whether Plaintiff has standing, given that Plaintiff made no effort to opt out of receiving faxes, and instead forwarded the faxes to his counsel. Defendants argue that Plaintiff does not fall within the "zone of interests to be protected" by the TCPA and JFPA, and thus that Plaintiff lacks standing to pursue its claim. Defendants identify the interests to be protected by those statutes as "individual privacy rights, public safety interests, and interstate commerce." (Defs.' Mem. Supp. Mot. for Summ. J. [Doc. # 90-1] at 17 (quoting *Tel. Sci. Corp. v. Asset Recovery Sols., LLC*, 2016 WL 4179150, at *12 (N.D. Ill. Aug. 8, 2016)).) They argue that in "passing the junk fax provisions of the TCPA specifically, Congress aimed to protect 'consumers [who] felt besieged by unsolicited faxes . . . despite [their] asking to be removed from senders' fax lists'" rather than allow a "professional plaintiff to turn ordinary communications received in the course of its long-standing business relationship into a litigation factory." (Defs.' Mem. at 17-18 (quoting S. Rep. 109-76 (2005) (alterations in Defs.' Mem.)).) Defendants acknowledge that the statutes were intended "to curb 'the burden of . . . paying for the cost of paper and toner, but also the opportunity costs of time spent reading and disposing of faxes, the time the machine is printing an advertisement and is not operational for other purposes, and the intrusiveness of faxes transmitted at inconvenient times, including the middle of the night.'" (Defs.' Mem. at 17 (quoting S. Rep. 109-76).) Defendants therefore conclude that "the purpose of the TCPA's junk fax provision is to allow for the effective vindication of privacy rights by giving individuals *control* over the faxes they receive and the ability to stop receiving unwanted faxes." (Defs.' Mem. at 17.) But Defendants' narrow formulation of the "zone of interests" to be protected does not follow from their own arguments which recognize a broader intent. Defendants focus only on one narrow part of the zone of interests—the right to opt out of advertising lists and to have that opt-out request honored by the sender. But as Defendants' own citations to the Congressional record make clear, the TCPA and JFPA created a broader zone of interests by preventing unwanted use of the recipient's fax machine resources,

including "the burden of . . . paying for the cost of paper and toner" and "the time the machine is printing an advertisement and is not operational for other purposes." (Defs.' Mot. at 17.) The TCPA and JFPA recognize the harm of having received unsolicited faxes along with the harm of being unable to opt out of receiving future faxes.

Defendants use their narrow formulation of the zone of interests to argue that Plaintiff falls outside that zone "because it made no attempt to vindicate its privacy rights." (*Id.* at 18.) Defendants argue that Plaintiff "courted additional faxes made under the approved supplier program," citing evidence that when Plaintiff "received the faxes under the supplier program, Gorss Motels' principal, Steven Gorss, confirmed that he would simply put them in a file to be mailed to his attorney, and not specifically review the faxes." (*Id.* (citing Parties' L.R. Stmts. ¶ 51).) But again, Defendants' conclusion does not follow from the evidence on which it relies. Mr. Gorss did acknowledge that he simply filed the fax advertisements he received and did not attempt to read or act on any opt-out language included in those faxes. (Parties' L.R. Stmts. ¶ 49.) But Defendants' attempt to conflate that inaction with affirmatively "court[ing] additional faxes" in order to bring additional lawsuits is unconvincing on this record.

Defendants cite to *Stoops v. Wells Fargo Bank, N.A.,* 197 F. Supp. 3d 782 (W.D. Pa. 2016), and *Telephone Science Corp. v. Asset Recovery Sols,* 2016 WL 4179150 (N.D. Ill. Aug. 8, 2016), in which the district courts concluded that the plaintiff was outside the zone of interests to be protected by the TCPA. In *Stoops,* the plaintiff "purchas[ed] cell phones with the hope of receiving calls from creditors for the sole purpose of collecting statutory damages," 197 F. Supp. 3d at 805, and in *Telephone Science Corp.,* the plaintiff did "not allege any injuries in the form of privacy invasion, nuisance, and/or inconvenience" but rather desired robocalls in order "to gather a 'large quantity' of data in order to 'detect high frequency robocalling patterns'" and thus provide an anti-robocalling service to its customers, 2016 WL 4179150, at *15. Defendants argue that Plaintiff was actually "*further*

away from the zone of interests protected by the TCPA than the plaintiffs in *Stoops* and *Tel. Sci. Corp*," who were "content to simply lie in wait for the phone to ring," because "Gorss Motels nevertheless continued to provide his number to Wyndham." (Defs.' Reply Supp. Mot. for Summ. J. [Doc. # 100] at 10.) But Defendants' argument overlooks the ongoing, unrelated corporate relationship between Plaintiff and Wyndham. That relationship undercuts Defendants' suggestion that Plaintiff continued to provide its fax number to Wyndham to "actively engage[] in conduct to induce additional faxes." (*Id.*) Absent any other suggestion that Plaintiff sought or desired unsolicited fax advertisements—as opposed to simply taking no action to opt out of receiving them—Defendants' analogy fails.

Moreover, "the vast majority of post-*Spokeo* TCPA cases have concluded that the invasion of privacy, annoyance and wasted time associated with robocalls is sufficient to demonstrate concrete injury." *Sandusky Wellness Center, LLC v. MedTox Sci. Inc.*, 250 F. Supp. 3d 354, 357 (D. Minn. 2017) (internal quotations omitted) (collecting cases). The *Sandusky* court rejected the defendant's attempt to draw a similar analogy to *Stoops v. Wells Fargo* because "[h]ere, by contrast, [plaintiff] did not purchase a fax machine for the sole purpose of drumming up TCPA litigation" but rather "used its fax machine for many business purposes." (*Id.*) And in *Gorss Motels, Inc.*, the court rejected a similar argument. *Gorss Motels, Inc. v. Sprint Comms. Co. LP*, -- F. Supp. 3d --, 2020 WL 818970, at \*6 (D. Conn. Feb. 19, 2020). In considering the plaintiff's choice to save faxed advertisements for its legal counsel instead of attempting to opt out, the court explained that "[n]either the Constitution nor penumbral principles of prudential standing license judges to disqualify plaintiffs from accessing the lawful remedies that Congress has prescribed to seek recovery for unlawful actions merely because those plaintiffs have engaged in strategically savvy efforts to preserve that access." *Id.* Moreover, "Gorss had a fax machine for its legitimate business purposes as a motel" and "was therefore well within the zone of interests that Congress targeted" in enacting the TCPA and JFPA. *Id.* This Court agrees with the reasoning of *Sandusky* and *Sprint Comms.* and

concludes as a matter of law that Plaintiff's claim falls within the protected zone of interests. Accordingly, Defendants' motion for summary judgment on the ground that Plaintiff lacks standing to assert a TCPA or JFPA claim is denied.

### D.  Prior Express Invitation or Permission

The heart of Plaintiff's claim is that Defendants' Fax was an "unsolicited advertisement," which the TCPA and JFPA prohibit. The TCPA defines unsolicited advertisements as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." 47 U.S.C. § 227(a)(5). "Express permission to receive a faxed ad requires that the consumer understand that by providing a fax number, he or she is agreeing to receive faxed advertisements." *In re Rules & Regs. Implementing the Telephone Consumer Protection Act (TCPA) of 1991*, 68 Fed. Reg. 44144, 44168, 2003 WL 21713245 (F.C.C. 2003). "[T]he burden of proof rests on the sender to demonstrate that permission was given." *In re Rules & Regs. Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005*, 71 Fed. Reg. 25967 ¶ 46 (F.C.C. 2006).

#### 1.  Defendants' Motion

Defendants argue that summary judgment should be entered in their favor claiming the record clearly demonstrates that Plaintiff gave prior express permission for the Fax. Defendants rely on the Site Contact Form to argue that "Gorss Motels voluntarily provided its fax number to Wyndham for inclusion in the franchise directory."  (Defs.' Mem. at 10.) Defendants argue that this "must be viewed against the backdrop of" the "long-running franchise relationship" between Plaintiff and Wyndham, an "important element of" which "was that Wyndham required Gorss Motels to meet its System Standards, which necessarily involved offering products from suppliers for the franchisees to use in the course of its franchise business." (*Id.*)

In support of their argument that the undisputed record evidence demonstrates that Plaintiff gave prior express consent to receive the Fax, Defendants rely heavily on the Eleventh Circuit's ruling in *Gorss Motels, Inc. v. Safemark Systems, LP*, 931 F.3d 1094 (11th Cir. 2019). In *Safemark*, Gorss Motels challenged several faxes sent in 2013 and 2015 by Safemark Systems, another participant in Wyndham's Approved Supplier Program. 931 F.3d at 1097-98. The *Safemark* court affirmed the district court's grant of summary judgment based on the finding that Gorss Motels gave prior express permission for the sending of those faxes. *Id.* at 1100.

The Eleventh Circuit concluded that Gorss Motels's "franchise agreements constitute an 'official act of allowing' Safemark the liberty to send them faxes," explaining that the franchise agreements "agreed that Wyndham 'may offer optional assistance to [them] with purchasing items used at or in the Facility,' and they specifically agreed that Wyndham 'affiliates may offer this service on [Wyndham's] behalf.'" *Id.* In combination with providing its fax number in a later section of that same agreement, the *Safemark* court concluded that Gorss Motels "gave express permission to receive fax advertisements from affiliates, including Safemark." *Id.*

The Eleventh Circuit supported its decision by finding that "[t]o constitute express permission, the agreements need not use magic words," and that express permission "does not require that a recipient state specifically that his permission includes faxed advertisements." *Id.* at 1101. Rather, because "[a] reasonable consumer would understand that assistance with purchasing items entails receiving information about buying products, and an advertisement is by definition an 'act of informing,' which includes 'the promotion of goods and services,'" *and* because "the hotels would have to receive this optional assistance with purchasing items—that is, advertisements—by some medium," *and* because the hotels "provid[ed] their fax numbers in their agreements," the Eleventh Circuit concluded that "the hotels invited the assistance or advertisements to come by fax." *Id.*

Defendants urge this Court to adopt similar reasoning and reach a similar conclusion that Plaintiff gave express permission to receive the Fax. But there is one important distinction in Defendants' argument: the entirety of the Eleventh Circuit's reasoning appears to have been based on language *only* included in the 2014 Franchise Agreement, which was enacted approximately nine months *after* the Fax at issue in this case was sent. Defendants contend that this point is not fatal to their argument because *Safemark* affirmed summary judgment for the defendant on faxes sent in both 2013, prior to the 2014 Franchise Agreement, and in 2015. (Defs.' Mem. at 11.) But a close reading of *Safemark* makes clear that the Eleventh Circuit's reasoning stems entirely from the language of the 2014 Franchise Agreement which states, "We may offer optional assistance to you with purchasing items used at or in the Facility. Our affiliates may offer this service on our behalf."[4]

Here, the 1988 Franchise Agreement however does not contain any comparable language. (1998 Franchise Agreement.) It requires Gorss Motels to "operate its motel at all times in strict compliance with the System," defined as the "plan or system" to follow "the specifications and quality of items of personal property to be used in the franchised motel . . . established by" Super 8 Motels, and "to purchase from [Super 8], or from any other source whose supplies and equipment have been approved in writing" certain enumerated items. (*Id.* at 2-3, 8.) Because the 2014 Franchise Agreement is inapplicable to these parties' dispute, the Court does not find *Safemark* to provide useful guidance here.

Moreover, this Court declines to adopt Defendants' view that collateral estoppel requires the Court to follow *Safemark*. (*See* Defs.' Mem. at 11.) As Defendants state, for collateral estoppel to apply, "the issues in both proceedings must be identical." (*Id.* (quoting *Faulkner v. National Geographic Enters. Inc.*, 409 F.3d 26, 37 (2d Cir. 2005).) Here, the issues

---

[4] Despite relying on the 2014 Franchise Agreement in establishing express permission, the *Safemark* court also appears to apply that permission to faxes received prior to the operation of that agreement without explanation.

are not identical because as the Defendants agreed at oral argument, the 2014 Franchise Agreement is not a binding contract with respect to the Fax and this is not direct evidence of permission. Since Defendants conceded at oral argument that the 2014 Franchise Agreement does not directly apply to the fax at issue, the facts are not identical and therefore *Safemark* does not collaterally estop Plaintiff's claim.

Beyond their reliance on *Safemark*, Defendants also argue that "witness testimony makes clear that" Plaintiff "agreed to receive" fax advertisements "by providing its number to its franchisor." (Defs.' Reply at 2.) In support of that position, Defendants rely on the statement by a Wyndham employee that "[i]n WSSI's experience, franchisees that provide WHG with their fax numbers want to receive communications by fax" and "very few franchisees have advised WSSI that they do not want to receive faxes providing information about Approved Suppliers over the past 5 or 6 years." (Ex. 3 (Gattuso Decl.) to Defs.' Mot. for Summ. J. [Doc. # 91-1] ¶ 12.) Therefore, Defendants argue, the only permissible conclusion from the evidence in the record is that Gorss Motels "underst[ood] that by providing a fax number, [it was] agreeing to receive faxed advertisements," *In re Rules & Regs. Implementing the Telephone Consumer Protection Act (TCPA) of 1991*, and thus Plaintiff gave express permission for the Fax. (Defs.' Reply at 2.)

But in drawing all reasonable inferences in Plaintiff's favor, the Court concludes that Wyndham's subjective belief that franchisees generally want to receive promotional faxes is insufficient to meet Defendant's burden of demonstrating that Gorss Motels specifically understood that, by providing its fax number, it was agreeing to receive faxed advertisements. Accordingly, Defendants are not entitled to summary judgment on the basis that the fax was solicited.

### 2. Plaintiff's Motion

Plaintiff argues that summary judgment should be entered in its favor because "AT&T admits that it did not contact Plaintiff and directly obtain consent to send the fax at issue."

(Pl.'s Mem. at 9 (internal quotation omitted); *see* Ex. F. (Defs.' Resp. to Pl.'s Reqs. for Admission) [Doc. # 99-3] No. 11 ("AT&T admits that it did not contact the Plaintiff directly and directly obtain consent to send the fax at issue.").) Because, Plaintiff argues, "there is no authority to 'suggest express invitation or permission can be imputed' from Wyndham to another party," AT&T's admission that it did not directly obtain consent makes clear that Plaintiff is entitled to summary judgment. (Pl.'s Mem. at 9 (quoting *E&G, Inc. v. Mount Vernon Mills, Inc.*, 316 F. Supp. 3d 908 (D.S.C. 2018)).) In the alternative, "[e]ven if AT&T could rely on 'prior express invitation or permission' obtained by Wyndham, the undisputed facts in this case show that Wyndham did not obtain such permission before the Fax was sent in January 2014." (Pl.'s Mem. at 11.)

Plaintiff argues that summary judgment should be entered in its favor because "there is no evidence from which a reasonable finder of fact could conclude that Wyndham obtained express permission to send the Fax." (Pl.'s Mem. at 12.) Plaintiff argues that the Site Contact Form merely provides its fax number and "says nothing about sending advertisements to Plaintiff's fax number." (Pl.'s Reply [Doc. # 102] at 4.) *See In re Rules & Regs. Implementing the Telephone Consumer Protection Act (TCPA) of 1991,* 10 FCC Rcd. 12391, 12408 (1995) ("We do not believe that the intent of the TCPA is to equate mere distribution or publication of a telephone facsimile number with prior express permission or invitation to receive such advertisements."). Plaintiff argues that unlike the language from the 2014 Franchise Agreement discussed in *Safemark*, the language regarding compliance with Super 8 Motel standards in the 1988 Franchise Agreement could not give rise to an understanding that Plaintiff was agreeing to receive fax advertisements.

While the Site Contact form alone is not sufficient to establish that Plaintiff expressly gave permission to receive advertisements like the Fax, Defendants point to other evidence in the record that, coupled with the Site Contact Form, could allow a reasonable finder of fact to conclude that Defendants had Plaintiff's permission to send advertisements like the Fax.

Specifically, Defendants identify evidence of Plaintiff's "long-standing franchisor/franchisee relationship" with Wyndham, including the requirement that Plaintiff purchase certain items directly from suppliers approved by Wyndham, and the provision of information to franchisees about the identities of approved suppliers. (*See* 1988 Franchise Agreement at 8.) While this evidence is insufficient to entitle Defendants to summary judgment, when drawing inferences in favor of Defendants for the purpose of assessing Plaintiff's motion for summary judgment, the evidence does create a genuine question of fact regarding whether Plaintiff gave permission to receive faxes from Wyndham and from approved suppliers, like Defendants. Thus, this Court denies both Plaintiff's and Defendants' motions for summary judgment on the issue of whether the Fax was solicited or unsolicited and leaves that determination to the finder of fact.

### E. Established Business Relationship

A narrow exception to the JFPA's prohibition of unsolicited fax advertisements exists for parties in an "established business relationship." Under this exception, an unsolicited fax advertisement is permissible if: (1) the unsolicited advertisement "is from a sender with an established business relationship with the recipient;" (2) the sender obtained the recipient's fax number either via "voluntary communication" from the recipient or from "a directory, advertisement, or site on the internet" as to which the recipient agreed to make the number publicly available; and (3) the unsolicited advertisement contains an opt-out notice meeting the requirements set forth in § 227(b)(2)(D). 47 U.S.C. § 227(b)(1)(C), (b)(2)(D).

Section 227(b)(2)(D) provides that an opt-out notice must, *inter alia*, be "clear and conspicuous and on the first page of the unsolicited advertisement"; "state that the recipient may make a request to the sender of the unsolicited advertisement not to send any future unsolicited advertisements to a telephone facsimile machine or machines and that failure to comply, within the shortest reasonable time, as determined by the [FCC], with such a request . . . is unlawful"; include "a domestic contact telephone and facsimile machine number for the

recipient to transmit" an opt-out request "to the sender"; and provide "a cost-free mechanism" of opting out which permits a recipient to do so "at any time on any day of the week."

### 1. Defendants' Motion

Defendants argue that they are entitled to summary judgment on this ground because 1) "Gorss Motels had an EBR with both Wyndham and AT&T"; 2) Gorss Motels provided its fax number to Wyndham in a "voluntary communication," and AT&T obtained that number through the Wyndham franchisee directory, in which Plaintiff agreed to make its number available; and 3) the opt-out language on the Fax was "substantially compliant" with the statutory requirements and sufficiently "informed the recipient of the ability and means to avoid future unsolicited advertisements." (Defs.' Mem. at 12-15.)

As to the first element, Plaintiff responds that only AT&T—not Wyndham—is the relevant "sender," and that Plaintiff had no established business relationship with AT&T. (Pl.'s Opp. at 20-21.) Plaintiff contends that its established relationship was with SNET, not AT&T, and that that relationship cannot be transferred among affiliates. (*Id.* at 21.) *See In re Rules & Regs. Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005 (*F.C.C. 2006) (The EBR exception does "appl[y] only to the entity with which the business or residential subscriber has had a 'voluntary two-way communication'" and does "not extend to affiliates of that entity."). As to the second element, Plaintiff appears not to dispute that it provided its fax number voluntarily or that AT&T obtained it through a directory in which Plaintiff agreed to make its number available. (*See* Pl.'s Opp. at 21-22.)

As to the third element, Plaintiff argues that "the opt-out notice on the Fax falls far short of compliance with the TCPA and FCC regulations." (*Id.* at 21.) Specifically, Plaintiff argues that the Fax "fails almost all of the requirements articulated in the TCPA," including that it "is not clear and conspicuous based on the font size," it "does not provide a domestic fax number or telephone number to which to send an opt-out request," it "does not state that

a recipient has a right to opt-out," it "does not state that a sender's failure to honor a compliant opt-out request within 30 days is unlawful," it "does not state that an opt-out request must identify the fax number to which the request relates," it "does not state that an opt-out request must be made using the instructions in the notice," and it "does not state that an opt-out request is enforceable only if the recipient does not subsequently give the sender express permission to send fax advertisements." (Pl.'s Opp. at 23.) Defendants respond by asserting that Plaintiff failed to allege any injury related to the insufficient opt-out notice and that Plaintiff therefore lacks the causation required for Article III standing necessary to bring this claim. (Defs.' Reply at 9). Specifically, they argue that "Gorss Motels would be in exactly the same position even if the [opt-out] notice was [] perfect" and that their injury therefore cannot be fairly traceable to the alleged conduct (Defs.' Mem. at 21 (citing *St. Louis Heart Ctr. Inc. v. Nomax*, 899 F.3d 500 (8th Cir. 2018).)

The Court concludes that Defendants fail to meet the evidentiary burden for summary judgment under both the full and substantial compliance standards. If full compliance is required, a standard which this Court favors, the Fax's opt-out language is obviously not compliant, and thus Defendants have not demonstrated that the EBR defense applies. Specifically, the quality of the Fax and the size of the font in the opt-out notice make portions of that notice somewhat difficult to read, including the email address and phone number to which recipients are directed to send any opt-out requests. Thus, even if substantial compliance with the opt-out notice requirements would allow Defendants to invoke the EBR defense, there remains a question of fact for the finder of fact to determine whether the Fax's opt-out notice is substantially compliant. Furthermore, the Court disagrees with Defendants' characterization that Plaintiff lacks standing because its alleged injuries are not fairly

traceable to the opt-out notice.[5] Rather, the Court finds that the content of the opt-out notice is merely an element of the Defendants' safe harbor defense and does not minimize the other injuries Plaintiff alleged as a result of the unsolicited fax. *See Sprint Comms. Co.*, 2020 WL 818970, at \*5; *Eric B. v. Si-Bone, Inc.*, 2019 WL 3577050, at \*4 (N.D. Cal. 2019) (holding that the content of the opt-out notice "is irrelevant to whether the Fax itself was unsolicited advertisement that led to Plaintiff's injury"). Accordingly, Defendants are not entitled to summary judgment in their favor as to their EBR defense.

### 2. Plaintiff's Motion

Plaintiff argues that it is entitled to summary judgment because Defendants cannot meet their burden to show that the EBR defense applies, focusing primarily on the missing aspects of the opt-out language. (Pl.'s Mem. at 12-13.) In support of its argument, Plaintiff cites the FCC's interpretation of the opt-out language requirements, which reject a "substantial compliance" standard because "[t]o the contrary, in enforcement actions, the Commission has proceeded under the understanding that full compliance is required." *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005*, 29 FCC Rcd. 13998 (F.C.C. 2014). But, as Defendants note, "that ruling was promulgated nine months after the fax at issue was sent," and "Gorss Motels makes no attempt to show why this order should apply retroactively." (Defs.' Reply at 8.) The case cited by Plaintiff as a "recent" example of a court rejecting the substantial compliance standard involves a fax sent in 2015, and the decision relied heavily on the FCC's 2014 regulation. *See Career Counseling Inc. v. Amsterdam Printing & Litho, Inc.*, 2018 WL 3037106,

---

[5] The facts in this case are distinguishable from those in *St. Louis Heart* where the district court found that the plaintiff "invited . . . the challenged faxes" and grounded its conclusion that the plaintiff alleged only a "bare procedural violation" on this finding. 899 F.3d at 504 (internal quotation omitted). Here, Plaintiff asserts that it never consented to receive the faxes and the Court finds that there remains a factual question as to whether the faxes were solicited and thus reliance on *St. Louis Heart* is inapposite. *See supra* at 8.

at *9 (D.S.C. June 19, 2018). Plaintiff also cites to two pre-2014 FCC adjudications which rejected the substantial compliance standard proposed by Defendants. (Pl.'s Opp. at 21-22.) But "an administrative order . . . is binding only on the parties to the particular proceeding," unlike "a valid exercise of the [agency's] rule-making power," which "is addressed to and sets a standard of conduct for all to whom its terms apply." *Columbia Broadcasting Sys. v. United States*, 316 U.S. 407, 418 (1942) (discussing effects of FCC regulations). Because, according to Defendants, that FCC ruling does not apply to the Fax and the opt-out language in the Fax is "functionally equivalent to what is required," Plaintiff "should not be able to defeat the [EBR] defense by engaging in a game of semantics." (Defs.' Mem. at 14 (internal quotation omitted).)

Because the Court concludes that there is a genuine question of fact as to whether the Fax was solicited, the Court will not determine the viability of the EBR defense for purposes of Plaintiff's summary judgment motion, so long as the factual dispute about whether the Fax was solicited remains. In other words, a failure of the Defendants' EBR defense would entitle Plaintiff to judgment in its favor *only if* the Fax has been found unsolicited. Accordingly, Plaintiff is not entitled to summary judgment in its favor on the EBR defense.

### F. Treble Damages

Defendant argues that Plaintiff's claim for treble damages should be stricken because it did not violate the TCPA "willfully or knowingly." *See* 47 U.S.C. § 227(b)(3). Courts have interpreted this statutory provision to require that the defendant knew or intended to send an *unsolicited* fax. *Lary v. Trinity Phys. Fin. & Ins. Servs.*, 780 F.3d 1101, 1107 (11th Cir. 2015) ("If we interpreted the statute to require only that the violator knew he was making a 'call' or sending a fax, the statute would have almost no room for violations that are not willful or knowing." (internal quotation and alterations omitted)).

Defendants argue that the "undisputed facts show that AT&T did not have knowledge of any purported TCPA violation," citing the declaration of Nancy Corelli, an AT&T employee.

(*See* Ex. 6 (Corelli Decl.) to Defs.' Mot. for Summ. J. [Doc. # 91-4].) Ms. Corelli avers that at the time of AT&T's decision to send the Fax, she "understood that Wyndham had permission to contact its franchisees by fax because of the franchisor/franchisee relationship between them." (*Id.* ¶ 7.) Defendants argue further that "[i]n the absence of notice that Gorss Motels had not given its permission to receive the fax, AT&T cannot be found to have violated the statute willfully or knowingly." (Defs.' Mem. at 20.)

Plaintiff does not respond to Defendants' argument regarding treble damages, (*see generally* Pl.'s Opp. to Defs.' Mot. for Summ. J. [Doc. # 99]), and actually confirms in its own summary judgment motion that it "does not seek treble damages in this motion, and seeks only the $500 minimum statutory damages under 47 U.S.C. § 227(b)(3)," (Pl.'s Mem. Supp. Mot for Summ. J. [Doc. # 93-1] at 2 n.1). The Court therefore grants Defendants' motion for summary judgment to the extent it seeks to strike any claim for treble damages.

**III. Conclusion**

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. # 90] is GRANTED as to treble damages and DENIED as to the issues of standing, consent, and an existing business relationship. Plaintiff's Motion for Summary Judgment [Doc. # 93] is DENIED.

IT IS SO ORDERED

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 22nd day of September 2020.